Stamatios Stamoulis
STAMOULIS & WEINBLATT LLC
New Jersey No. 1790-1999
800 N West Street, Third Floor
Wilmington, DE 19801
Telephone: (302) 999-1540
Facsimile: (302) 762-1688
stamoulis@swdelaw.com

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Golden State Medical Supply, Inc. <br><br> Plaintiff, <br><br> v. <br><br> AustarPharma LLC; AustarPharma Research, LLC; AustarPharma Laboratories, LLC; Austar International Limited; Rong Liu; Bostal Drug Delivery Co., Ltd.; and Guangzhou Bristol Drug Delivery Co., Ltd. <br><br> Defendants. | **AMENDED COMPLAINT** <br><br> Civil Action No. 3:21-CV-12092 <br><br> *Document Electronically* <br><br> *Jury Trial Demanded* |

## <u>INTRODUCTION</u>

1.  Golden State Medical Supply, Inc. ("GSMS") sues the named defendants for several counts of breach of contract; civil RICO; fraud; unjust enrichment; tortious interference; breach of good faith and fair dealing; and misrepresentation.

2.  GSMS specializes in the serialization, order fulfillment, custom packaging and labeling, repackaging, and distribution of prescription and non-prescription medications. GSMS serves customers in the United States.

3.  GSMS contracted with AustarPharma LLC to provide generic drugs to

GSMS. But AustarPharma LLC, in concert with the other Defendants, failed to supply the required products, breached the supply contracts, fraudulently induced GSMS to accept purchase credits, defrauded GSMS with a series of continuous misrepresentations, failure to supply products, which ultimately injured GSMS's business and its relationships.

## The Parties

4.     Plaintiff, GSMS, maintains a principal place of business at 5187 Camino Ruiz Camarillo, CA 93012.

5.     Defendant Austar International Limited ("AIL-HK") is, on information and belief, a company organized under Hong Kong law with its principal place of business in Hong Kong. Upon information and belief, AIL-HK is also registered to do business in the State of New Jersey; it has an Entity ID # 0100981356, with Edison, NJ as a principal place of business; and was incorporated on or about 6/11/2007. Upon information and belief, AIL-HK maintains a place of business at: Austar International Limited; Unit 6, 1/F, Block B, New Trade Plaza; 6 On Ping St.; Shatin, N.T., Hong Kong.

6.     Defendant Rong Liu ("Liu") is an individual who, on information and belief, resides in Warren, New Jersey. Upon information and belief, his address is: 60 Briarwood Drive E, Warren, NJ 07059.

7.     Upon information and belief, Liu also maintains many different bank accounts, including at branches on Mountain Blvd, Warren, NJ; Morris Turnpike, Short Hills, NJ; and Maple Avenue, Basking Ridge, NJ.

8.     Upon information and belief, Liu is also associated with the following companies:

**Subject: Rong Liu**
**Incorporation Appendix**

| Name of Entity | Filing State | Filing Number | Entity Type | Date of Registration | Subject's Role | Listed Address | Registered Agent | Status | Date of Status |
|---|---|---|---|---|---|---|---|---|---|
| Austarpharma, LLC | Montana | E1125373 | Foreign Limited Liability Company | July 12, 2019 | Member | 18 Mayfield Ave Edison, NJ 08837 | CT Corporation Systems | Active | February 12, 2021 |
| Austarpharma, LLC | Utah | 11017439-0161 | Foreign Limited Liability Company | October 10, 2018 | Member | 18 Mayfield Ave Edison, NJ 08837 | CT Corporation Systems | Active | November 20, 2019 |
| Austarpharma, LLC | Florida | M14000003090 | Foreign Limited Liability Company | May 6, 2014 | President, CEO | 18 Mayfield Ave Edison, NJ 08837 | NRAI Services, Inc | Inactive | February 29, 2020 |
| Austarpharma, LLC | Vermont | 359921 | Foreign Limited Liability Company | July 11, 2019 | Member | 18 Mayfield Ave Edison, NJ 08837 | CT Corporation Systems | Active | November 23, 2019 |
| Bristol Youcare, LLC | New Jersey | 400558396 | Domestic Limited Liability Company | March 18, 2013 | Registered Agent | 60 Briarwood Drive E Warren, NJ 07059 | Rong Liu | Active | September 30, 2015 |
| Edison Pharma, LLC | New Jersey | 400562789 | Domestic Corporation | April 4, 2013 | Registered Agent | 60 Briarwood Drive E Warren, NJ 07059 | Rong Liu | Active | August 3, 2016 |
| Austarpharma Laboratories, LLC | New Jersey | 600208168 | Domestic Limited Liability Company | July 16, 2004 | Organizer | None Listed with State | Theodore Gast | Active | NA |
| Austarpharma Research, LLC | New Jersey | 600277086 | Domestic Limited Liability Company | August 15, 2006 | Organizer | 300 Columbus Circle Suite F Edison, NJ 08837 | Rong Liu | Active | NA |
| Austarpharma, LLC | New Jersey | 600207878 | Domestic Limited Liability Company | July 14, 2004 | Member | 18 Mayfield Ave Edison, NJ 08837 | Theodore Gast | Revoked | June 17, 2010 |

9.     Defendant Guangzhou Bristol Drug Delivery Co., Ltd. ("Bristol") is, on information and belief, a company headquartered in the city of Guangzhou in the People's Republic of China. Upon information and belief, Bristol maintains a place of business at: Guangzhou Bristol Drug Delivery Co., Ltd., Unit 6/F, Block C2 Enterprise Accelerator Park, No. 11 Kaiyuan Avenue, Science City of Guangzhou Hi-tech Industrial Development Zone.

10.     In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 1, filed 27 Nov. 2019, Judge McNulty noted that "Bristol" is now known as "Bostal Drug Delivery Co., Ltd." (now "Bostal").

11.     Defendant AustarPharma LLC ("AP-NJ") is, upon information and belief, a company incorporated in Delaware and headquartered in Edison, New Jersey, where it maintains a research and development facility dedicated to drug delivery technology innovation and product development. It has an Entity ID #0600207878.

12.     Further, upon information and belief, AP-NJ is also identified with the following information:

| Entity Name: | Austarpharma, LLC |
|---|---|
| Address: | 18 Mayfield Ave<br>Edison, NJ 08837 |
| Phone: | (732) 225-2930 |
| Ownership: | Rong Liu |
| FEIN: | 51-0523899 |
| DBA(s): | None Located |

13. Upon further information and belief, AP-NJ is also associated with the following companies, each company using the 18 Mayfield, NJ address:

Subject: Austarpharma, LLC
Incorporation Appendix

| Name of Entity | Filing State | Filing Number | Entity Type | Date of Registration | Subject's Role | Listed Address | Registered Agent | Status | Date of Status |
|---|---|---|---|---|---|---|---|---|---|
| Austarpharma, LLC | Montana | E1125373 | Foreign Limited Liability Company | July 12, 2019 | Member | 18 Mayfield Ave Edison, NJ 08837 | CT Corporation Systems | Active | February 12, 2021 |
| Austarpharma, LLC | Utah | 11017439-0161 | Foreign Limited Liability Company | October 10, 2018 | Member | 18 Mayfield Ave Edison, NJ 08837 | CT Corporation Systems | Active | November 20, 2019 |
| Austarpharma, LLC | Florida | M14000003090 | Foreign Limited Liability Company | May 6, 2014 | President, CEO | 18 Mayfield Ave Edison, NJ 08837 | NRAI Services, Inc | Inactive | February 29, 2020 |
| Austarpharma, LLC | Vermont | 359921 | Foreign Limited Liability Company | July 11, 2019 | Member | 18 Mayfield Ave Edison, NJ 08837 | CT Corporation Systems | Active | November 23, 2019 |
| Austarpharma, LLC | New Jersey | 600207878 | Domestic Limited Liability Company | July 14, 2004 | Member | 18 Mayfield Ave Edison, NJ 08837 | Theodore Gast | Revoked | June 17, 2010 |
| Austarpharma, LLC | Alabama | FLL 294-599 | Foreign Limited Liability Company | January 14, 2014 | Member | 18 Mayfield Ave Edison, NJ 08837 | National Registered Agents, Inc | Active | March 13, 2014 |
| Austarpharma, LLC | Maine | 20140658FC | Foreign Limited Liability Company | March 11, 2014 | Member | 18 Mayfield Ave Edison, NJ 08837 | National Registered Agents, Inc | Active | May 18, 2020 |

14. Defendants AustarPharma Research, LLC ("AP-Research") and AustarPharma Laboratories, LLC ("AP-Labs"), upon information and belief, are U.S. based LLC's organized by either solely or in combination Rong Liu, AIL-HK, and/or AP-NJ. Upon information and belief, AustarPharma Research, LLC is registered to do business in the State of New Jersey; it has an Entity ID #0600277086; and has a principal place of business in Edison, NJ, and was incorporated on or about 8/15/2006.

15. Upon information and belief, AustarPharma Laboratories, LLC is registered to do business in the State of New Jersey; it has an Entity ID #0600208168; and has a principal place of business in Edison, NJ, and was incorporated on or about 7/16/2004. Further AP-Research and/or AP-Labs act in concert with any or all of the other Defendants.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction under 28 U.S.C. §1331 and §1332 because of the federal claims and diversity of the parties. This Court has supplemental jurisdiction over the other claims asserted herein under 28 U.S.C. §1367.

17.    Jurisdiction and Venue are appropriate for Liu because he is the majority owner of a New Jersey company (AP-NJ); he resides in this District; and availed himself of this Court's jurisdiction in the *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey lawsuit. ("AP-HK lawsuit"). Further the underlying allegations relate to conduct that occurred in the State of New Jersey.

18.    Jurisdiction and Venue are appropriate for AIL-HK because AIL-HK availed itself of the jurisdiction of this Court by filing its own lawsuit in this District Court. See AP-HK lawsuit. Further, AIL-HK is registered to conduct business in this State.

19.    Jurisdiction and Venue are appropriate for Bostal because this Court has already ruled that Bostal is a proper party. In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 32, filed 27 Nov. 2019, Judge McNulty stated that "I find that the ways in which Bostal is alleged to have intentionally targeted AustarPharma in New Jersey to be sufficient to meet the third-prong of the Calder effects test. Bostal's motion to dismiss on jurisdictional grounds is therefore denied." To the extent necessary, Bristol is also subject to Jurisdiction and Venue in this Court for the same reasons as Bostal is.

20.    Jurisdiction and Venue are appropriate for AP-NJ because it is business registered to do business in New Jersey; it has a principal place of business in New Jersey; and the conduct complained of occurred in the State of New Jersey. Further, AP-NJ was subject to jurisdiction and venue in the AP-HK lawsuit.

21.    Jurisdiction and Venue are appropriate for AP-Research and AP-Labs because they are registered to do business in this State; are owned by common ownership (Liu); and upon information belief conduct their activities in concert with the other Defendants.

22.    All of the conduct which forms the basis for the claims set forth in this Complaint took place within the applicable statutes of limitation.

## Background of AP-HK vs. AP-NJ Lawsuit

23.    Upon information and belief, Rong Liu ("Liu") is a majority owner of AP-NJ.

24.    Upon information and belief, AIL-HK owns a minority share of AP-NJ.

25.    Upon information and belief, AIL-HK sued Liu and AP-NJ, for among other things, breach of fiduciary duty; breach of operating agreement; conversion of property; Federal trade secret theft; misappropriation of trade secrets; tortious interference with prospective economic advantage; and judicial expulsion under N.J.S.A. § 42:2C-46e. See *Austar International Limited v. AustarPharma LLC et al,* District of New Jersey docket no.: 2:19-cv-08356-KM-MAH, filed on 11 March 2019 ("AP-HK lawsuit").

26.    GSMS expressly incorporates by reference to the lawsuit complaint in the AP-HK lawsuit; District of New Jersey docket no.: 2:19-cv-08356-KM-MAH; Document #1, Filed 03/11/19.

27.    GSMS asserts that the AP-HK lawsuit complaint (Document #1) lays out the allegations of fraud, conversion, theft of trade secrets, and all other claims that AIL-HK asserted against AP-NJ.

28.    GSMS expressly incorporates by reference to the opinion of Judge McNulty in the AP-HK lawsuit; as District of New Jersey docket no.: 2:19-cv-08356-KM-MAH, document no.: 64, filed 27 Nov. 2019. GSMS expressly incorporates all of Judge McNulty's findings of fact and conclusions of law.

29.    According to AP-HK lawsuit Para. 6, AIL-HK asserted that, "Rather than work to expand AustarPharma's business opportunities abroad, Liu secretly founded a number of competitive companies in the PRC and has been steadily working to capture the PRC and U.S. markets for himself. Using AustarPharma's intellectual property, personnel and trade name, Liu has been raising capital in China, developing and commercializing medical technologies and products similar, if not identical, to those developed by AustarPharma, and trying to claim the PRC market for himself. He also has taken steps – which have accelerated in recent months – to spread his illicit business activities to the United States. For example, a number of current or former AustarPharma employees who are now also affiliated with Liu's competitor entities have filed patent applications in the PRC in the name of those competitor entities, including several patent applications in the name of the Guangzhou Company. Some of these patent applications involve technology that is very similar to what AustarPharma has developed, reflecting a clear intent to compete directly with AustarPharma. Liu's self-serving actions violate basic tenants of New Jersey corporate law, agency law, and tort law, as well as the federal Defense of Trade Secrets Act of 2016. Austar only learned of at

least some of these actions in recent years, including as recently as 2018."

30.    According to AP-HK lawsuit Para. 17, since its incorporation, AP-NJ has focused on the research, development, manufacture, and commercialization of finished generic drug products and drug-delivery technology products, as well as on providing research and development services to pharmaceutical companies worldwide.

31.    According to AP-HK lawsuit Para. 23, to date, AustarPharma has received at least two Abbreviated New Drug Application ("ANDA") approvals from the FDA for generic drug products. They are for methocarbamol tablets, granted in 2011, and for sertraline hydrochloride tablets, granted in 2009. Both products are currently sold in the United States in prescription drug form. Methocarbamol is used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries, and sertraline hydrochloride is a selective serotonin reuptake inhibitor that treats depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and anxiety.

32.    According to the current edition of the US FDA's so-called "Orange Book", AP-NJ is the record owner of the following generic drug approvals:



33. AP-NJ manufacturers the drug Product S under a contract with GSMS.

34. According to AP-HK lawsuit Para.24, AustarPharma has entered co-development agreements with numerous pharmaceutical companies based primarily in the U.S. and China, pursuant to which AustarPharma conducts the necessary research and development to prepare generic drugs for launch worldwide – including all necessary preparations for applying for FDA approval – in exchange for some combination of a development service fee, marketing rights and a share in the profits from the sale of those drugs in certain specified regions (often the U.S.) or worldwide. Under these contracts, AustarPharma's co-development partners are also entitled to market and sell the products in certain specified regions (often PRC) or worldwide. AustarPharma receives millions of dollars in revenues from these co-development partnerships.

35. AustarPharma is a joint venture and its members are co-joint venturers. The LLC was formed on July 14, 2004, through filing a certificate of formation with the New Jersey Secretary of State pursuant to the New Jersey Limited Liability Company Act.

36.    According to AP-HK lawsuit Para. 29, under the Operating Agreement, the "Members" of AustarPharma are Austar, Liu, and DFH (the "Members").

37.    According to AP-HK lawsuit Para. 30, Article 6.6 of the Operating Agreement contains the covenants of the Members to one another. Specifically, it provides that the Members agree to "perform and observe or, so far as such Member is able to do, to procure that the Company shall at all times act in accordance with, the provisions of this Agreement," Art. 6.6(b), and to "vote such Member's Membership Units in all matters so as to give full force and effect to the provisions of this Agreement," Art. 6.6(d).

38.    According to AP-HK lawsuit Para. 31, pursuant to Article 6.1 of the Operating Agreement, "the approval or consent of Members owning an aggregate of more than 60% of the total LLC Interests shall be required" in order for AustarPharma to take certain actions set forth therein. These include decisions to "cause the Company to participate in any capacity . . . in any business organization or enterprise," to "own, improve, develop, operate, manage and lease real estate," to "borrow money from any Member, bank, lending institution or other lender for any purpose of the Company," and to "enter into, terminate or amend any Related Party Transaction." Art. 6.1(a)-(n).

39.    According to AP-HK lawsuit Para. 32, meanwhile, Article 6.2 sets forth actions that AustarPharma cannot take without the "approval or consent of Members owning an aggregate of more than 80% of the total LLC Interests." These include actions to "consolidate or merge with any Person or with any other business," to "effectuate any reorganization of the Company," and to "incur indebtedness or create liability . . . the effect of which . . . will result in a total debt to equity ratio of the Company at any time

exceeding 50%." Art. 6.2(a)-(j).

40.    According to AP-HK lawsuit Para. 36, pursuant to Article 5.1 of the Operating Agreement, AustarPharma also has Managers who are appointed annually by unanimous approval of the Members. As of the Effective Date, and as set forth in Article 5.3(b), AustarPharma had two Managers: (i) Mars Ho Kwok Keung ("Mr. Ho"), the Chairman of Austar, who is based in Hong Kong; and (ii) Liu, the President and Chief Executive Officer of AustarPharma, who is based in New Jersey.

41.    According to AP-HK lawsuit Para. 37, Article 5.2 of the Operating Agreement defines  the authority of the Managers, who are tasked with managing and controlling day-to-day operations of AustarPharma "for the benefit of all of the Members." The signature of any Manager is generally sufficient to bind AustarPharma and the Managers generally "have the full and entire right, power and authority to manage and conduct the Business of the Company."

42.    According to AP-HK lawsuit Para. 38, meanwhile, Article 10 of the Operating Agreement provides that AustarPharma shall have a Board of Directors (the "Board") consisting of four directors ("Directors"), the number of which may be increased or decreased by unanimous consent of the Members. Austar is entitled to designate two Directors and to designate the Chairman of the Board, and Liu and DFH are each entitled to designate one Director.

43.    According to AP-HK lawsuit Para. 39, Austar designated Mr. Ho as Chairman of the Board and also designated Ms. Gu Xun to serve on the Board. Liu designated himself to serve on the Board, and DFH designated Ms. Tsui Kwan Amelia. Art. 10.3.

44.     According to AP-HK lawsuit Para. 36, pursuant to Article 5.1 of the Operating Agreement, AustarPharma also has Managers who are appointed annually by unanimous approval of the Members. As of the Effective Date, and as set forth in Article 5.3(b), AustarPharma had two Managers: (i) Mars Ho Kwok Keung ("Mr. Ho"), the Chairman of Austar, who is based in Hong Kong; and (ii) Liu, the President and Chief Executive Officer of AustarPharma, who is based in New Jersey.

45.     According to AP-HK lawsuit Para. 37, Article 5.2 of the Operating Agreement defines the authority of the Managers, who are tasked with managing and controlling day-to-day operations of AustarPharma "for the benefit of all of the Members." The signature of any Manager is generally sufficient to bind AustarPharma and the Managers generally "have the full and entire right, power and authority to manage and conduct the Business of the Company."

46.     According to AP-HK lawsuit Para. 38, meanwhile, Article 10 of the Operating Agreement provides that AustarPharma shall have a Board of Directors (the "Board") consisting of four directors ("Directors"), the number of which may be increased or decreased by unanimous consent of the Members. Austar is entitled to designate two Directors and to designate the Chairman of the Board, and Liu and DFH are each entitled to designate one Director.

47.     According to AP-HK lawsuit Para. 39, Austar designated Mr. Ho as Chairman of the Board and also designated Ms. Gu Xun to serve on the Board. Liu designated himself to serve on the Board, and DFH designated Ms. Tsui Kwan Amelia. Art. 10.3.

48.     According to AP-HK lawsuit Para. 44, the Operating Agreement also states

that "[n]o spending which is the subject of any of the foregoing reports shall be made until the report related to such spending shall have been approved as set forth herein." Art. 7.1.

49.    According to AP-HK lawsuit Para. 48, despite his clear duties under AustarPharma's operating documents and New Jersey law, Liu established separate competing companies to trade on, and profit from, AustarPharma's technology, funding, human capital and good reputation, with a focus on AustarPharma's primary markets of the U.S. and China.

50.    According to AP-HK lawsuit Para. 49, on July 2013, Liu formed Guangzhou Bristol Drug Delivery Co., Ltd., which engages in the same business, and covers the same markets, as AustarPharma. The Guangzhou Company sometimes refers to itself publicly as Guangzhou Bosiyi Controlled Release Pharmaceutical Co., Ltd., or simply as Bristol.

51.    According to AP-HK lawsuit Para. 49, based on publicly available information, including company profiles published on Chinese websites, the Guangzhou Company holds itself out as a high-tech pharmaceutical company specializing in the research and development of new drug delivery systems. It is located in the city of Guangzhou, which is widely known in PRC as "Guangzhou Science City" and as "the Silicon Valley of South China." Liu gave himself the roles of Chairman of the Board, Manager and Legal Representative of the Guangzhou Company.

52.    According to AP-HK lawsuit Para. 50, Liu's experience with AustarPharma is portrayed in the Chinese media as being highly relevant to the value that he brings to Guangzhou Company, providing further evidence of the significantly overlapping

business of the two entities and Liu's intent to wrongfully benefit from the good will and reputation of AustarPharma.

53. According to AP-HK lawsuit Para.51, for instance, public profiles of Guangzhou Company circulated in the PRC note that Liu and his team members "have rich experience in the development and industrialization of innovative pharmaceutical preparations and new drug delivery system drugs."

54. According to AP-HK lawsuit Para. 52, online profiles of the Guangzhou Company refer directly to Liu's work with AustarPharma in the United States. For example, one such profile dated November 12, 2017 states:

> In 2004, Dr. LIU RONG and his team founded AustarPharma. LLC in the United States (located in Edison City, New Jersey, United States), to provide research and development services of pharmaceutical preparations for global pharmaceutical enterprises, and the company has cooperated with many global well-known pharmaceutical companies on development of many drugs. Dr. LIU RONG and his team have developed more than 20 preparation products that have been listed in the United States or are passing the FDA certification, including many different technologies and dosage forms, and solubilization technology, oral sustained and controlled release preparation technology, oral quick-release preparation technology of insoluble drugs.

55. According to AP-HK lawsuit Para. 57, based on publicly available information—including patents in the PRC and information about grants the Guangzhou Company has applied for and received in connection with its employment of international employees—Liu has employed individuals at the Guangzhou Company while they were simultaneously employed by AustarPharma.

56. According to AP-HK lawsuit Para. 58, public profiles of Guangzhou Company specifically state that Liu formed the company using members of the AustarPharma team.

14

57.    According to AP-HK lawsuit Para. 59, specifically, the employees numbered one through four below are individuals who, based on publicly available information, have simultaneously held positions at both companies. The remaining individuals are known to have held positions at both companies close in time, and Austar anticipates, on information and belief, that discovery will reveal more of these individuals were employed by both companies simultaneously.

| No. | Name | Position at Guangzhou Company | Position at AustarPharma |
|-----|------|-------------------------------|--------------------------|
| 1 | Dillon Gao | Core staff; Director, Vice President of Business and Strategic Development | Vice President |
| 2 | Zhanguo Yue | Core staff; Patent Inventor | Formulation |
| 3 | Na Zhang | Core Staff | Strategic and Business Development Consultant |
| 4 | Tiffany Wu | Director until 2014 | HR & Admin Manager |
| 5 | Wei Li | Vice President of PreparationDepartment; Patent Inventor | Formulation |
| 6 | Yan Liu | Registration Supervisor | Formulation TeamJunior Scientist |
| 7 | Yuehan Hou | Pharmaceutical Preparation Supervisor | Formulation Team Junior Scientist |
| 8 | Xiaoling Zhang | Registration Supervisor | Formulation TeamJunior Scientist |

| 9 | Junjie Peng | Pharmaceutical PreparationSupervisor; Patent inventor of subsidiary ofBristol | Scientist |
|---|---|---|---|
| 10 | Wu Xueming | Core employee | Employee |
| 11 | Tong (Tony) Weiqin | Chief Science Officer; Patentinventor | President |
| 12 | Zhihong Zhang | Patent inventor | Formulation |
| 13 | Yuanjian Wang | Deputy Director of Analysis | Formulation |

58.    According to AP-HK lawsuit Para.66, both as to the specific generic drugs developed and being developed by AustarPharma, and as to the drug delivery system technology being created by AustarPharma to serve as a platform upon which AustarPharma will develop other products (i.e., controlled- release technologies, such as osmotic pump systems), Liu has unfairly pursued market opportunities at his own companies in the PRC and prospectively worldwide that should belong to AustarPharma. Liu has done so through the Guangzhou Company, and other entities he controls, which (as noted above) have taken AustarPharma's business model, personnel and products, and put them to use for Liu's personal gain.

59.    According to AP-HK lawsuit Para. 67, Liu has pursued business opportunities, sales, and scientific partnerships that AustarPharma always intended to pursue itself—and that in his role as CEO, Liu knew AustarPharma intended to pursue.

60.    According to AP-HK lawsuit Para. 69, Liu has also been using AustarPharma's image in the PRC to raise capital for his competitive entities, as well as visibility, a positive trade reputation, and cooperation agreements with government

authorities in high-tech zones in the PRC. This underscores that Liu is diverting corporate opportunities that would otherwise belong to AustarPharma for his own benefit. For example, online postings in PRC (including for recruitment) pertaining to the Guangzhou Company tout the success Liu and his team with AustarPharma.

61.    According to AP-HK lawsuit Para. 71, the announcement touted AustarPharma as one of the "designated suppliers of the U.S. government" with experience in research, development and production of release preparations and insoluble medicines. It also stated that AustarPharma has seven FDA-approved preparations and medicines on the market in the United States, and has close cooperation with "the main channel[s] of American medicines" such as CVS and Walgreens. The same announcement introduced Liu as the chairman of both AustarPharma and Guangzhou Company.

62.    According to AP-HK lawsuit Para. 75, thus, with the assistance of AustarPharma personnel, Liu has used AustarPharma's Trade Secrets to develop competing products and technologies for the Guangzhou Company and his other entities, establishing patents for Guangzhou Company that should rightfully belong to AustarPharma.

63.    According to AP-HK lawsuit Para. 78, as the CEO, President and a founding partner of the AustarPharma joint venture, Liu owes fiduciary duties to AustarPharma, as well as all of its shareholders and Members (including Plaintiff). Every director and officer of a New Jersey corporation owes fiduciary duties to the corporation and its shareholders. Liu therefore owes AustarPharma and Plaintiff the duty of loyalty.

64.     According to AP-HK lawsuit Para. 79, the duty of loyalty requires directors, among other things, to act for the benefit of the corporation and its shareholders rather than for any personal interest, and to faithfully seek to maximize the returns for the corporation and its shareholders. Misappropriating corporate business opportunities or engaging in direct or indirect competition with the corporation for personal benefit is a breach of the duty of loyalty.

65.     According to AP-HK lawsuit Para. 80, by virtue of his role within AustarPharma, Liu had access to AustarPharma's Trade Secrets, confidential business plans, research and development, customers, and contract partners, for years.

66.     According to AP-HK lawsuit Para. 80, Liu breached the duty of loyalty he owed to AustarPharma and all of its shareholders and Members by engaging in a steady campaign of self-dealing and diversion of corporate opportunities to himself.

67.     According to AP-HK lawsuit Para. 81, Liu formed the Guangzhou Company, as well as his other entities, with the purpose of usurping corporate opportunities for himself that should have belonged to AustarPharma. The Guangzhou Company is in the business of developing, manufacturing, and commercializing generic drug products and medical delivery technologies in the U.S. and the PRC. Thus, Liu has launched a new company that is engaged in direct competition with AustarPharma in the same primary markets. According to AP-HK lawsuit Para. 82, moreover, Liu has employed several AustarPharma employees at the Guangzhou Company and has used the AustarPharma brand to advance the reputation of the Guangzhou Company.

68.     According to AP-HK lawsuit Para. 83, Liu's focus on the Guangzhou Company and his other competitive ventures also reflects a lack of prioritization of the

growth and development of AustarPharma, further evidencing a breach of his fiduciary duties.

69.    According to AP-HK lawsuit Para. 90, Article 7.1 directs the CEO to "prepare and deliver to the Members [specified] reports for the next Fiscal Year, which shall be accompanied by corresponding reports for the current year," including the Company's "Investment Plan," "Budget authorization," "Management salary budget," "Authorization for personnel," "Internal personnel movement," and other things. Under Article 7.3, "[t]he Chief Executive Officer shall provide the Members copies of (a) monthly unaudited financial statements for the Company . . . (b) quarterly unaudited financial statements for the Company . . . and (c) annual audited consolidated financial statements for the Company . . . accompanied by an annual management report."

70.    According to AP-HK lawsuit Para. 93, Liu's breach of his obligations under Article 12 has harmed Plaintiff by usurping business opportunities that should have belonged to AustarPharma, resulting in lost revenue and opportunities to the detriment of its Members.   Liu's breach of his obligations under Article 7 has harmed Plaintiff by depriving it of its contractual right to access certain financial information pertaining to AustarPharma.

71.    According to AP-HK lawsuit Para. 96, Defendants Liu and Guangzhou Company took or aided in the diversion of corporate funds belonging to AustarPharma and its Members for his own use, through Guangzhou Company, and exercised or assisted in the exercise of dominion and control over corporate funds in a manner that was inconsistent with AustarPharma and its Members' right to the use, possession, and enjoyment of those funds, thereby depriving AustarPharma and its Members of their

property rights. In addition, Defendants poached AustarPharma personnel to work for the Guangzhou Company.

72.    According to AP-HK lawsuit Para. 97, AustarPharma and Plaintiff (here AIL-HK) have suffered damages that are the reasonable and proximate result of this conversion. AustarPharma and Plaintiff have expended time and money in pursuit of retrieving the converted property. Liu and Guangzhou Company have engaged in this wrongful conduct intentionally, willfully, maliciously, and with the intent to injure AustarPharma and Plaintiff. Plaintiff, on its own behalf and on behalf of AustarPharma, requests that this Court award damages for losses Plaintiff and AustarPharma have suffered as a direct or indirect result of Defendants' conversion.

73.    According to AP-HK lawsuit Para. 97, Plaintiff, on behalf of AustarPharma, also requests that the Court order Liu and Guangzhou Company to return all property that Liu has taken from AustarPharma.

74.    According to AP-HK lawsuit Para. 121, AustarPharma is in direct competition with the Guangzhou Company in the business of developing, manufacturing, and commercializing generic drug products and medical delivery technologies in the U.S. and the PRC.

75.    According to AP-HK lawsuit Para.123, without justification, Defendants Liu and Guangzhou Company intentionally interfered with AustarPharma's prospective economic advantage by diverting opportunities that should belong to AustarPharma to Guangzhou Company, and unlawfully using AustarPharma's Trade Secrets in order to do so. Were it not for this intentional interference, there was a high likelihood that AustarPharma would have secured sales and/or co-development contracts that have

instead been diverted to the Guangzhou Company, and thus, Liu and Guangzhou Company's unlawful interference resulted in, and will continue to result in, damages to AustarPharma.

76.    In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 23, filed 27 Nov. 2019, Judge McNulty stated that "the complaint alleges other facts giving rise to an inference of misappropriation. AustarPharma [here AP-NJ] had been developing this technology for years. Borstal [sic, Bostal] was quickly able to develop, market, and even patent the same technology. It is inferable that this was not a coincidence, given that the same individual is at the helm of these two similar businesses."

### GSMS Contracts with AP-NJ

77.    On or about Feb. 19, 2014, GSMS and AP-NJ entered into a "Product Supply Agreement", which included one or more Exhibits that described the drug products that GSMS would buy, and that AP-NJ would supply.

78.    The Feb. 19, 2014 agreement included one drug product ("Product M"). Per the terms of the Product M Agreement, required among other things, that AP-NJ supply Product M that GSMS ordered and timely deliver those Product M products to GSMS.

79.    Since 2019, AP-NJ has consistently breached its obligations to supply Product M either in full and/or on time.

80.    With respect to Product M, since May 2020 to April 2021, GSMS estimates that AP-NJ's only provides 31% of the product quantity ordered on time. In June, July, and August 2020 and then February, March, and April 2021, AP-NJ had

zero percent on time delivery with 0% of the product quantity ordered. From May 2020 to Jan. 2021, AP-NJ averaged no more than 67% of the order timeline.

81.    The AP-NJ breach of contract as to Product M can be shown as:



82.    At no point has AP-NJ adequately justified its poor compliance rate; AP-NJ provides only token, abstract excuses for its failure to timely provide product in the ordered quantity.

83.    AP-NJ's failure to supply causes economic and reputational harm to GSMS because GSMS's customers cannot receive the product that they ordered. GSMS's failure to supply products to its customers leads to potential claims against GSMS, which are directly related to AP-NJ's failure to supply products to GSMS, per contract.

84.    GSMS told AP-NJ that Product M would be further sold to the U.S. Government under a government contract. Under applicable government contracting rules, the GSMS had to certify that the Product M complied with, among other things, certain Made In America regulations. Per those regulations, GSMS cannot simply change the source of the Product M; rather there is longer process involved. This includes notifying the U.S. Government that GSMS intends to change the source of

Product M, and obtain the Government's permission to amend the source of Product M.

85.    To further comply with Government regulations, AP-NJ had to provide a certificate to GSMS, which demonstrates that AP-NJ knows that GSMS is beholden to AP-NJ for the supply of Product M; and that despite AP-NJ's repeated failures to comply with the supply contract, GSMS cannot reasonably buy replacement Product M from any other source.

86.    AP-NJ strangleholds GSMS into continuing to do business with AP-NJ because it knows that GSMS cannot find replacement Product M easily and qualify that new source for the government contracts.

87.    AP-NJ knowingly induces GSMS into placing more Product M orders. AP-NJ knows that it cannot or will not produce the required quantities and knows that it cannot or will not ship the product in a timely manner. Each acceptance of an order for Product M coupled with the promises to fulfill the order, made over interstate wire communication, qualifies as a distinct fraudulent activity, and provides continuity and relationship of each activity that further the pattern of racketeering. The AP-NJ employee, upon information and belief is Doris Zhang, that accepted each order did so with the fraudulent intent to further the racketeering.

88.    AP-NJ is located in New Jersey and GSMS is located in California. AP-NJ and GSMS use electronic communications to conduct business, including the use of the internet, telephones, email, and other forms of interstate electronic means. GSMS pays AP-NJ through a factoring company and uses electronic wire/banking procedures to pay AP-NJ. Upon information and belief, the factoring company uses the same or similar electronic procedures to pay AP-NJ.

89.     Upon information and belief, AP-NJ does not have any bank accounts in its name. The lack of bank accounts in its own name, coupled with the use of a factoring company to handle accounts receivables, further evidences the racketeering activity and underlying fraud, that AP-NJ (through its owner Liu and AIL-HK) intends, and does, intentionally and with fraudulent intent, defraud GSMS.

90.     Upon information and belief, AP-NJ owns the following vehicles or has rights in the following vehicles:

| Year Make Model: | 2017 BMW 750 |
|---|---|
| Owner Address: | 18 Mayfield Ave Edison, NJ 08837 |
| Estimated Value: | **$32,000 - $42,000** |

| Year Make Model: | 2015 Honda Odyssey |
|---|---|
| Owner Address: | 18 Mayfield Ave Edison, NJ 08837 |
| Estimated Value: | **$13,000 - $19,000** |

| Year Make Model: | 2004 Acura MDX |
|---|---|
| Owner Address: | 18 Mayfield Ave Edison, NJ 08837 |
| Estimated Value: | **$5,000 - $8,000** |

91.     Upon further information and belief, AP-NJ is being sued by its landlord for failure to pay rent. The lawsuit is *Federal Business Centers, Inc. vs. Austarpharma LLC*, docket no.: MID LT 004892-20; filed July 13, 2020, in Middlesex County, NJ. AP-NJ rents, as a tenant, two properties from the landlord. The landlord identified the rent past

due as:

## A.    Premises (A)

With respect to Premises (A), as of June 23, 2020, the Tenant owes to the Landlord the total sum of $321,532.27 in past-due Rent, as set forth in the Statement of Account dated June 23, 2020, attached hereto as **Exhibit A** (the "Actual Past-Due Rent for Premises (A)").  Of this sum, $279,881.05 is for Base Net Rent, $21,814.00 is for Premises Expenses, and $19,837.22 is for Additional Rent (comprised of: (i) interest attributable to the Tenant having defaulted under the terms of the Rent Deferral Agreement dated January 2020 (see clause 5 thereof) and (ii) Liquidated Damages attributable to the Tenant having defaulted under the terms of the Lease dated August 28, 2009 (see clause 3 thereof)).

## B.    Premises (B)

With respect to Premises (B), as of June 23, 2020, the Tenant owes to the Landlord the total sum of $88,745.52 in past-due Rent, as set forth in the Statement of Account dated June 23, 2020, attached hereto as **Exhibit C** (the "Actual Past-Due Rent for Premises (B)").  Of this sum, $65,589.17 is for Base Net Rent, $17,762.00 is for Premises Expenses, and $5,394.35 is for Additional Rent (comprised of: (i) interest attributable to the Tenant having defaulted under the terms of the Rent Deferral Agreement dated January 2020 (see clause 5 thereof) and (ii) Liquidated Damages attributable to the Tenant having defaulted under the terms of the Lease dated August 28, 2009 (see clause 3 thereof)).

92.    Upon information and belief, in the landlord-tenant dispute, Rong Liu guaranteed AP-NJ's future rent payments:

GUARANTY

The undersigned Guarantor hereby covenants and agrees that if there shall occur a monetary default by the Tenant in the payments of the "Reduced Past-Due Rent for Premises (A)" and/or the "Reduced Past-Due Rent for Premises (B)" as defined and due under this Default Cure Agreement (the "Agreement"), then the undersigned shall, upon the expiration of the cure periods provided for in the Agreement,: (i) pay such Reduced Past-Due Rent due and payable by the Tenant to the Landlord; (ii) pay to the Landlord reasonable attorneys' fees incurred by the Landlord as a result of any such default and/or the enforcement of this clause.  In the event that the Tenant files a proceeding under the United States Bankruptcy Code, such action shall not, in any way, affect the validity of this Guaranty▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  This clause shall not alter any obligations of the Tenant under the terms of the Lease.

P.V.

By:    Ron Liu
       Guarantor

93.    Upon information and belief, AP-NJ also is subject to other liens and judgments:

| | |
|---|---|
| **Filing Number:** | L00345713 |
| **Filing Type:** | Judgment |
| **Filing Date:** | May 22, 2013 |
| **Amount:** | Unknown |
| **Location:** | Brunswick, NJ |
| **Creditor:** | 300 Columbus Circle Investors |
| **Status:** | Placed |

| | |
|---|---|
| **Filing Number:** | L006064 |
| **Filing Type:** | Judgment |
| **Filing Date:** | October 2, 2014 |
| **Amount:** | $23,883 |
| **Location:** | Middlesex County, NJ |
| **Creditor:** | Thermo Pak |
| **Status:** | Unsatisfied |

94.    Upon information and belief, AP-NJ also is subject to many UCC filings:

Subject: Austarpharma
UCC Filing Appendix

| Original Filing Number | Original Filing Date | Filing Agency | Debtor(s) | Secured Party | Status |
|---|---|---|---|---|---|
| 53565482 | August 28, 2019 | Trenton, NJ | Austarpharma, LLC | CT Corporation System | Active |
| 53493011 | July 16, 2019 | Trenton, NJ | Austarpharma, LLC | Leaf Capital Funding, LLC | Active |
| 52916713 | July 30, 2018 | Trenton, NJ | Austarpharma, LLC | De Lage Landen Financial Service, Inc | Active |
| 52568985 | December 26, 2017 | Trenton, NJ | Austarpharma, LLC | CT Corporation System | Active |
| 52273575 | June 16, 2017 | Trenton, NJ | Austarpharma, LLC | CT Corporation System | Active |
| 51831442 | August 24, 2016 | Trenton, NJ | Austarpharma, LLC | US Bank National Association | Active |
| 51807122 | August 5, 2016 | Trenton, NJ | Austarpharma, LLC | Maintainco, Inc<br>Toyota Industries Commercial Finance, Inc | Active |
| 51744511 | June 24, 2016 | Trenton, NJ | Austarpharma, LLC | Fountain Leasing 2013, LP | Active |
| 51695213 | May 24, 2016 | Trenton, NJ | Austarpharma, LLC | Fountain Leasing 2013, LP | Active |
| 26329222 | February 27, 2013 | Trenton, NJ | Austarpharma, LLC | Fountain Leasing 2013, LP | Lapsed |
| 26127729 | January 12, 2012 | Trenton, NJ | Austarpharma, LLC | Fountain Leasing 2013, LP | Lapsed |
| 50055281 | August 2, 2011 | Trenton, NJ | Austarpharma, LLC | Smith Medical Partners | Terminated |
| 25866056 | December 22, 2010 | Trenton, NJ | Austarpharma, LLC | Fountain Leasing 2013, LP | Lapsed |
| 51695213 | December 8, 2020 | Trenton, NJ | Austarpharma, LLC | LSQ Funding Group, LC | Continued |

Below is a brief description each of the secured parties listed above that was found on their respective websites:

| Leaf Capital Funding, LLC | LEAF, as part of the People's United Equipment Brands, is ranked number 10 in the top 50 bank finance/leasing companies in the U.S. |
|---|---|
| De Lage Landen Financial Service, Inc | DLL is a global asset finance partner enabling businesses to more easily access equipment, technology and software to help them grow. We deliver sustainable and effective financing solutions, along with insights and advice, that drive smarter and more economical use of capital assets. |
| Maintainco, Inc | Offering sales, rentals, parts & services for forklifts and scissor lifts . Located in Hackensack, NJ. |
| Fountain Leasing 2013, LP | Fountain Partners' mission is to be the most flexible and efficient source of equipment lease capital for growing businesses.  Fountain has become a trusted funding source by specializing in equipment leasing for venture, growth and expansion stage businesses throughout the United States. |
| Smith Medical Partners | Smith Medical Partners, LLC is located in Springfield, IL, United States and is part of the Drug Wholesalers Industry. |
| LSQ Funding Group, LC | LSQ was founded in 1996 to fill a gap in traditional bank financing. Ever since, we have approached invoice financing with a client-first mentality emphasizing transparency, convenience, and accessibility to capital. |

95.    On or about June 12, 2019, GSMS added another product to the existing supply agreement.  The new product involves another product ("Product S").

96.    From the addition of Product S to the existing agreement, AP-NJ failed to timely deliver the required quantities of Product S to GSMS.

97.    As with Product M, AP-NJ knows that Product S is also for subsequent government supply.  AP-NJ provided GSMS with the requisite certificates for government contracting compliance.

98.    AP-NJ knows that, like Product M, once GSMS obtains a government contract for the supply of Product S, GSMS must use AP-NJ's Product S for the supply.

99.    GSMS cannot easily switch Product S supply to another supplier.

100.    As with Product M, AP-NJ failed to comply with the quantities and delivery timelines for Product S.

101.    As is typical in the pharmaceutical distribution industry, a buyer may obtain a cheaper price for a particular product from another supplier. The buyer

typically will contact the original supplier of the product to initiate a return of any inventory on hand. The original supplier can also typically initiate a return of the inventory back to the drug manufacturer. As such, the buyer's return of the inventory can result in drug manufacturer receiving the product back and issuing a refund to the supplier. The original supplier, instead of receiving unused inventory from the buyer, can negotiate with the buyer for an adjustment, which simplistically results in the buyer keeping the current inventory but paying the cheaper price. Under this arrangement, the buyer obtains a purchase credit; the original supplier then arranges for the purchase credit to be paid by the drug manufacturer. But a benefit of this arrangement is that the drug manufacturer need not obtain physical return of the product, which may or may not be further re-sellable.

102.    On or about Sept. 23, 2019, GSMS notified AP-NJ, that the U.S. Government initiated the purchase credit process with GSMS in regards to Product S. GSMS in turn initiated the purchase credit process with AP-NJ. This communication was to Frank Stiefel, the Chief Commercial Officer of AP-NJ.

103.    There is no dispute that AP-NJ agreed to a new term such that AP-NJ avoided taking return of inventory. GSMS requested that AP-NJ pay the purchase credit in full back to GSMS. On or about Nov. 2019, AP-NJ, through Liu, AP-NJ told GSMS that it could not afford to pay the purchase credit in full in one payment.

104.    Upon information and belief, if AP-NJ paid to GSMS the full purchase credit, AP-NJ told GSMS that it would cripple AP-NJ.

105.    AP-NJ had every conceivable financial incentive to avoid paying GSMS the purchase credit as it would ruin AP-NJ. Further, from GSMS's perspective, if AP-NJ was

ruined, GSMS would have no hope of satisfying its obligations to its Government buyer in the near future. AP-NJ knew that it had GSMS in a stranglehold because it knew that GSMS needed to keep AP-NJ as an ongoing supplier. On March 4, 2020, GSMS and AP-NJ negotiated side agreements wherein AP-NJ agreed to provide purchase credits instead of the one-time lump sum payment. This communication occurred over interstate wires. AP-NJ's representatives were Liu and Gary Gentles.

106. On March 6, 2020, GSMS and AP-NJ executed two side agreements wherein GSMS in consideration of not forcing AP-NJ to pay the full purchase credit; and wherein AP-NJ agreed to satisfy the purchase credit, AP-NJ agreed to provide Product S on a further reduced price basis. The differential between the original purchase price of Product S and the reduced price would be used to offset the purchase credit that AP-NJ owes to GSMS. AP-NJ's representatives were Liu and Gary Gentles.

107. AP-NJ agreed in these March 6th agreements that it owed GSMS the purchase credit, called in the March 6th contract as the "SSA Credit" and as such, AP-NJ is estopped from asserting that it owes GSMS that SSA Credit amount. The SSA Credit is worth more than $3.8 million. AIL-HK conspired with the other Defendants to make the agreement as AIL-HK was an investor-owner of AP-NJ and would lose its investment otherwise. For the other Defendants, they are direct beneficiaries of the fraudulent transfers of assets from AP-NJ and conspired with AP-NJ to make the agreement otherwise its sources of assets would disappear.

108. By executing the March 6th, 2020 agreements at the reduced price, AP-NJ induced GSMS to stay with AP-NJ, knowing that GSMS needed AP-NJ to stay in business. AP-NJ in agreeing to the March 6, 2020 agreements knew that GSMS would be

beholden to AP-NJ for continued supply of Product S. AP-NJ also knew that GSMS would be subject to further failure to supply penalties from its buyers if GSMS could not supply Product S.

109.    Since executing the March 2020 agreements, AP-NJ consistently breached the contracts by failing to supply the required quantities at the required times.

110.    At least AP-NJ and Liu made repeatedly made promises to comply with the order requirements, including adding additional shifts of employees, adding weekend shifts, etc.

111.    On or about, May 5, 2020, GSMS and AP-NJ entered into another Purchase Agreement that updated the current agreements, now included Product M and Product S in the schedule of products to deliver. Section 1.2 of the May 5th Agreement specifically referenced the Product S purchase credit dispute and resolution. On Nov. 10, 2020, GSMS and AP-NJ held a meeting over interstate wires communication. AP-NJ's representatives were Liu and Doris Zhang. Among other things, GSMS told AP-NJ that it was not complying with the requirements to supply the products on a timely basis. AP-NJ told GSMS that it would try to produce Product S per the contracts. GSMS told AP-NJ that it was owed the millions in purchase credit and that AP-NJ needed to pay. Liu and the other Defendants conspired to dupe GSMS into accepting new delivery schedules of Product S knowing that AP-NJ could not produce such products and timely deliver the products. This was done in an effort to forestall payment of the purchase credit that AP-NJ indisputably owed to GSMS. Per the Nov. 10, 2020 meeting conclusion, the Parties were to meet again in a few weeks for AP-NJ to provide the update on Product M and S supply, including efforts to pay the purchase credit.

112. On Nov. 24, 2020, the Parties met again over interstate wire communications. AP-NJ's representatives were Liu and Zhang. Among other things, the Parties talked about how AP-NJ was going to pay the purchase credit. AP-NJ told GSMS that it would investigate how to make sales of other products to other non-GSMS customers to pay GSMS back. Liu also promised to secure bank loans or other notes to pay GSMS back. Liu and the other Defendants conspired to defraud GSMS in delaying payment of the purchase credit. Liu had no incentive to obtain loans or other investments, incur interest charges, to simply pay back GSMS. Not only would AP-NJ have to pay back the loan to the loan provider, it would need to pay additional interest charges. AIL-HK also knew that as a co-owner of AP-NJ that it would be liable also for loans. Further, AP-NJ knew that it had GSMS in the stranglehold in that GSMS could not simply to other suppliers. There is no incentive for AP-NJ to incur additional charges knowing it had GSMS on the hook. Further, AP-NJ was being sued by its landlord for failure to pay rent as of July 2020. By failing to pay its rent, AP-NJ apparently had no money to pay GSMS. Finally, obtaining other loans would financially encumber AP-NJ's books because the loan will appear on the books as a significant liability. On Dec. 8, 2020, the Parties then met again over interstate wire communications. The agenda for this meeting was solely related to the Product M and S supply problems and the repayment of the purchase credit. GSMS also discussed obtaining AP-NJ's audited financial statements. Further, GSMS told AP-NJ that time was now of the essence to make the purchase credit repayments. AP-NJ's representatives were Liu and Zhang. AP-NJ hesitated on committing to provide the audited financial statements. AP-NJ, through Liu and Zhang, knew that: (i) it could not produce audited statements because an auditor

31

could not sign off on the statements as the statements would be false, misleading, and fraudulent, produced for the intent to deceive the auditor and/or GSMS; (ii) the financial statements, if produced, would show that AP-NJ had no assets to pay the purchase credit, and AP-NJ, AIL-HK, and other Defendants were conspiring to withhold any payments to GSMS until the remaining assets were pilfered away; and (iii) any statements would show that AP-NJ had made no efforts to produce the Products, could not meet quantity orders because of capacity constraints, and that AP-NJ had no or little raw materials to produce the Products. AP-NJ knowing that it could not produce audited financial statements, continued to use interstate wire communications to defraud GSMS with false promises, false assurances, to keep GSMS money that it was owed, using the time delays to continue to convert GSMS's money to AP-NJ's own, all the while the Defendants conspired to continue to defraud GSMS.

113.    Recalling that AIL-HK sued AP-NJ for, among other things, breach of contract, fraud, conversion, theft of trade secrets, etc. in the AP—HK lawsuit. See, District of New Jersey docket no.: 2:19-cv-08356-KM-MAH; Document #1, Filed 03/11/19. GSMS expressly incorporates by reference to the opinion of Judge McNulty in the AP-HK lawsuit; as District of New Jersey docket no.: 2:19-cv-08356-KM-MAH, document no.: 64, filed 27 Nov. 2019. GSMS expressly incorporates all of Judge McNulty's findings of fact and conclusions of law.

114.    Per the AP-HK lawsuit docket, the parties there entered into a settlement dated Dec. 19, 2020, in view of the ongoing litigation between the parties in China.

115.    As such, during the midst of the very lawsuit between AIL-HK and AP-NJ, GSMS and AP-NJ were negotiating a monumental purchase credit that if failed,

would have crippled AP-NJ.  AIL-HK and AP-NJ, and the other Defendants conspired with the fraudulent intent to ensure that GSMS did not obtain any money. Because Defendants (except for AP-NJ and Liu) are not in New Jersey, the pattern of racketeering involved ex-NJ entities and involved interstate wire communications. On March 30, 2021, the Parties met again over interstate wire communications. AP-NJ's representatives were Liu and Zhang. Liu for the first time alluded to COVID as a basis for supply problems. AP-NJ did not give any details on the COVID problems, as if saying COVID was a magic incantation to ameliorate or explain away any issues. GSMS challenged back telling AP-NJ that other suppliers did not have such severe supply problems. AP-NJ also falsely told GSMS that it was running extra shifts on weekdays and weekends to catch up. Upon information and belief this was false and misleading as supply of product never materialized. Also, given AP-NJ's financial condition, there would be no money to pay for any overtime.  At this meeting, GSMS specifically asked Liu if Liu's investors were aware that AP-NJ owed millions to GSMS. Liu dodged the question saying that AP-NJ has a contract for supply on Products M and S. GSMS asked if AP-NJ was being sued in any other way; Liu said no. This was false because he had been sued by AIL-HK and the landlord. AP-NJ continued to perpetuate the false statements and fraud that AP-NJ did not see any problems with past, current, or future performance.  AP-NJ continued to perpetuate the fraud, continued to steal GSMS's purchase credit, commit acts of wire and mail fraud, repeatedly induced GSMS to forestall any future actions, continued to deprive and defraud the U.S. Government by failing to supply Products M and S to GSMS knowing that the products were destined for the U.S. Government.

**AP-NJ and Other Defendants Conspire to Defraud GSMS**

116.   Because of the significant financial impact of GSMS's purchase credit and AP-NJ's continued assertions that it could not pay; AP-NJ and the other Defendants conspired to defraud GSMS by duping it into new contracts and extracting new agreements that delayed the purchase credit payment. This was done with full knowledge of all Defendants.

117.   AIL-HK was in the midst of suing AP-NJ for fraud, conversion of company assets, among other things. AIL-HK sued for recovery of investment money from AP-NJ. If GSMS succeeded in obtaining the full purchase credit payment from AP-NJ, then upon information and belief, not enough assets would remain in AP-NJ to satisfy any judgment in favor of AIL-HK against AP-NJ.

118.   AIL-HK is a significant shareholder of AP-NJ. Per the terms of the contractual relationships between AIK-HK and AP-NJ,

119.   Recognizing that AIL-HK was suing AP-NJ for converting and/or otherwise squandering AP-NJ assets, AIL-HK was fully aware that AP-NJ could not and should not pay GSMS otherwise AIK-HK would not have any assets from which to collect.

120.   As stated previously, AP-NJ was obligated to keep AIL-HK informed of major events. An immediate one-time payment of more than $3.8 million would qualify as a major event for which AP-NJ would keep AIL-HK informed.

121.   Further, AIL-HK was suing all Defendants for fraud, conversion, notably including that Liu has squandered AP-NJ assets for the benefit of his other businesses, including the other Defendants. As such, AIL-HK conspired with the other Defendants and created an enterprise to ensure that GSMS could not get paid its full amount,

34

otherwise AIL-HK could not assure assets would be available to it; and that the other Defendants business plans would be forestalled because no further funding from AP-NJ would occur. As such, GSMS's payment would forestall the Defendants' ability to conduct their lawsuits or businesses.

122.    Bostal, AP-Research, and AP-Labs are owned by Liu. Each have a vested interest in ensuring that AP-NJ's assets are intact so that those assets can be fraudulently transferred to them, thereby injuring GSMS. Bostal, AP-Research, and AP-Labs, being commonly controlled by Liu, conspired with Liu and AIL-Hk to induce GSMS to take actions detrimentally to GSMS with the intent to defraud GSMS. Upon further information and belief, any payments made to the factoring company for Products M and S are then funneled to these entities, with the intent to ensure that AP-NJ has little to no assets.

123.    Liu is the mastermind behind the frauds he committed against AIL-HK and AP-NJ, and conspired with the other Defendants to defraud GSMS. Liu did so with each communication he had with GSMS and used interstate wires to perpetuate the fraud. Each instance provide continuity and relationship in furtherance of the past, current, and future racketeering.

124.    The Defendants, through AP-NJ, used electronic communications (including the internet, email, telephones, cellular communications, wires, etc.), over interstate borders, to fraudulently induce GSMS into: delaying payment of the purchase credit that AP-NJ indisputably owed;  promising a payment and delivery schedule of Product M and Product S with full knowledge that given the history of missed deliveries and quantities it could not fulfill; created schedules of orders and deliveries that it knew could not be

fulfilled; continued to accept new orders of Product M and Product S knowing that they could not be fulfilled; demanded payments from GSMS for those Products knowing that such money GSMS paid to AP-NJ was indeed owed to GSMS; AP-NJ failed to create any accounting accrual or create an escrow of money that could be used to pay GSMS the purchase credit; continuously communicated with GSMS promising new delivery timelines and quantities and yet failing to deliver on those new promises; and failed to adequately or timely explain the reason for the continued delays of Product M and Product S.

125.    Upon further information and belief, AP-NJ sold Product M and Product S to other customers. AP-NJ, in conjunction with the conspiracy to defraud GSMS, manufactured Product M and Product S and sold it to others instead of GSMS. That is, knowing that AP-NJ is in breach of supply to GSMS for Products M and S, AP-NJ nonetheless makes the Products and sells that very product to other third parties. One of those parties that buy the Product M and S competes directly with GSMS. The Defendants knew that GSMS could not buy Product M and Product S from other suppliers due to the Government restrictions. As such, AP-NJ would rather sell Product M and Product S to others instead of at the lower reduced prices that would whittle away the purchase credit owed. AP-NJ and the other Defendants knew that the other buyers could buy Product M and Product S from other suppliers thus AP-NJ would lose sales to others if it satisfied its obligations to GSMS. As part of the conspiracy to defraud GSMS, Defendants would string GSMS along with trivial amounts of Product M and Product S so that they could claim that they were complying with the GSMS contracts, when Products were being diverted to other customers.

126.    Upon information and belief, GSMS learned through trade channels that AP-NJ (now as a qualified Government supplier) was bidding on contracts for Product M and Product S with GSMS's own competitors. The Defendants knew that GSMS could not go to other suppliers even though the Defendants were bidding against GSMS.

127.    Each Defendant collectively or amongst themselves in combination with any other Defendant created an enterprise to defraud GSMS and breach the GSMS contracts. Each Defendant is jointly and severally liable for the damages GSMS claims.

128.    Because GSMS informed AP-NJ and AP-NJ knew that the sale of Product M and Product S were intended for the U.S. Government, AP-NJ and Defendants perpetrated a fraud on the U.S. Government in that by duping GSMS into staying in contract for those products (under false pretenses), GSMS would induce the Government into staying in contract with GSMS. The net effect, however, of the Defendants fraudulently actions resulted in the Government not receiving its products in a timely and required manner. And AP-NJ and Defendants knew that the Government itself was constrained by its contracts with GSMS to stay in contract because of the difficulty in sourcing qualified suppliers of Product M and Product S.

129.    In support of the following, GSMS incorporates by reference the above allegations. In terms of Defendants violations, GSMS asserts that the Defendants violated, including but not limited to:

N.J.S. 2C:20-3. Theft by unlawful taking or disposition

N.J.S. 2C:20-4. Theft by deception

N.J.S. 2C:21-7. Deceptive business practices

N.J.S. 2C:21-16. Securing execution of documents by deception

18 U.S.C. § 1341 - Frauds and swindles

18 U.S.C. § 1343 - Fraud by wire, radio, or television

18 U.S.C. § 1349. Attempt and conspiracy

130.   Each Defendant individually or collectively created an enterprise that based on predicate act violations of multiple federal wire and mail fraud laws, and New Jersey state laws, committed multiple acts of racketeering.  More than twice, AP-NJ and the other Defendants acted in concert to perpetuate the fraud scheme, including but not limited to each telephone call, each email, each non-conforming shipment shipped across State-lines to GSMS, each payment received from GSMS, each use of interstate wires to effectuate orders and payments, etc. The acts of racketeering violated federal and state RICO laws.

131.   Liu in his personal capacity guaranteed the rent payments of AP-NJ, as identified in the landlord vs. AP-NJ lawsuit over rent (see above). As such, Liu should also be personally liable for all actions of AP-NJ.

### Count I – Breach of Contract By AP-NJ

132.   GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

133.   As to the existence of contracts, GSMS and AP-NJ executed one or more contracts to supply Product M and Product S. There is no dispute that contracts existed between GSMS and AP-NJ.

134.   GSMS placed many orders with AP-NJ to supply the Product M and Product S; but AP-NJ many times failed to deliver the required amount by the required time. It is undisputed that AP-NJ received the orders, promised to deliver, but failed to

deliver. Moreover, it is undisputed that AP-NJ often communicated with GSMS to inform GSMS that yet again the deliveries would be late and would not be for the contractual amounts. Even for the reduced quantities to deliver, AP-NJ more often than not reset the delivery dates to later.

135.    GSMS and AP-NJ communicated many times about AP-NJ's failures to supply, AP-NJ made countless promises to remedy its poor performance, but continues to breach the contracts by breaching its promises.

136.    AP-NJ cannot dispute that it owes GSMS the purchase credit that it agreed to. Without providing meaningful products at the reduced price, GSMS cannot obtain the benefit of the purchase credit.

137.    GSMS is continuing to suffer irreparable harm and injury, both reputational and economic. GSMS further has not been paid the purchase credit it is indisputably owed. Further, per the GSMS contract, GSMS is entitled to assess against AP-NJ both: (a) pass through service level penalties assessed by the U.S. Government against GSMS; and (b) failure to supply penalties for AP-NJ's failure to supply the contracted quantity by the requisite time. GSMS has estimated that the failure to supply penalties by virtue of AP-NJ's failure to supply product ordered is more than $1 million. Further, GSMS estimates that the Government service level penalties can be many millions of dollars.

### Count II -  Promissory Estoppel As To Defendants Liu, AP-NJ, AIL-HK

138.    GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

139.    As mentioned above, Liu and AIL-HK are co-owners of AP-NJ. AP-NJ is the

contracting party with GSMS.

140.    Defendants Liu, AIL-HK through and including AP-NJ made clear and definite promises to GSMS relating to fulfilling orders of Product M and Product S. It is undisputed that the underlying supply contracts were breached by AP-NJ. Rather than face termination of the contracts, these Defendants made these clear and definite promises that AP-NJ would comply with the order requirements, deliver the required amounts by the required timelines.

141.    These Defendants made these promises with the expectations that GSMS will rely on them. Defendants knew that GSMS re-sold the products to the Government and as such, AP-NJ was a qualified supplier to GSMS. GSMS relied on these promises because AP-NJ was the qualified supplier under the GSMS – Government contracts. It was reasonable for GSMS to rely on such promises because otherwise GSMS would have to undergo the longer process to get another supplier approved, if any.

142.    These Defendants continued to make multiple promises based on multiple purchase orders.

143.    GSMS continued to rely to its detriment on these promises because it put GSMS into the position of having to tell its customers about potential stock-outs, and delayed GSMS's ability to obtain another trustworthy source of product.

144.    GSMS is owed the purchase credit amount and these Defendants promised that GSMS would be paid its purchase credit through the continued supply of the products that did not happen.  Further, GSMS is entitled to assess failure to supply and service level penalties against AP-NJ, and AP-NJ is estopped from asserting that it does not owe such penalties.

145.   GSMS is continuing to suffer irreparable harm and injury, both reputational and economic. GSMS further has not been paid the purchase credit it is indisputably owed. These Defendants cannot undo what they promised.

## Count III – Fraud As To All Defendants

146.   GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

147.   All Defendants collectively or individually have committed fraud, or participated in the fraud, against GSMS.

148.   As stated herein, the Defendants made material representations of fact by repeatedly taking purchase orders from GSMS, not telling GSMS that it could not fulfill the orders in the required quantities and required timelines, then telling GSMS that orders could be fulfilled in new timelines, wherein such new timelines were continually missed and/or the shipments would be a fraction of the ordered quantities.

149.   The Defendants indisputably knew that such orders could not be fulfilled. They had already demonstrated an inability to meet its obligations. They knew that they could not fulfill the orders. When they made new promises, they knew they could not be kept. They kept shifting deadlines and quantities. They made false promises about adding shifts on weekdays and weekends.

150.   Defendants intended that GSMS rely on such statements because, among other things, Defendants were in the midst of their own internal lawsuits, some Defendants were in the process of squandering AP-NJ assets for the benefit of other Defendants, and that the purchase credit was for a sizeable amount.

151.   GSMS reasonably relied on those promises because GSMS was owed

millions of dollars in payments from Defendants. Further GSMS had qualified AP-NJ as the government authorized supplier. GSMS could not instantly switch providers; rather government contracting provisions required compliance.

152.    In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 27, filed 27 Nov. 2019, Judge McNulty stated that, "whether Dr. Liu acted intentionally and with malice. Malice "focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934), '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse. *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 39 (1989) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (1950)); see also *Belinski v. Goodman*, 139 N.J. Super. 351, 354 A.2d 92, 94 (1976) (defining actual malice as "nothing more or less than intentional wrongdoing-an evil-minded act"). Here, the complaint asserts that Dr. Liu, without justification, acted out of his own-self interest to enrich himself at the expense of his obligations to AustarPharma. (See, e.g., Compl. Para. 6, 123). At the motion to dismiss stage, these are sufficient assertions of intent and malice."

153.    GSMS has been economically damaged. GSMS is indisputably owed the purchase credit amount. Further GSMS suffers its own failure to supply penalties due to the Defendants failure to supply.

## Count IV – Fraudulent Inducement As To All Defendants

154.    GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

155. All Defendants collectively or individually have committed fraud, or participated in the fraud, against GSMS, by inducing GSMS to accept new terms of contracts, new delivery terms, new timelines, all the while the Defendants would not or could not comply with the new program.

156. The Defendants made material representations about GSMS's ability comply with the contracts, ability to satisfy order requirements, ability to timely ship products, etc.

157. The Defendants indisputably knew that such orders could not be fulfilled. They had already demonstrated an inability to meet its obligations. They knew that they could not fulfill the orders. When they made new promises, they knew they could not be kept. They kept shifting deadlines and quantities. They made false promises about adding shifts on weekdays and weekends.

158. As stated herein, the Defendants made material representations of fact by repeatedly taking purchase orders from GSMS, not telling GSMS that it could not fulfill the orders in the required quantities and required timelines, then telling GSMS that orders could be fulfilled in new timelines, wherein such new timelines were continually missed and/or the shipments would be a fraction of the ordered quantities.

159. Defendants intended that GSMS rely on such statements because, among other things, Defendants were in the midst of their own internal lawsuits, some Defendants were in the process of squandering AP-NJ assets for the benefit of other Defendants, and that the purchase credit was for a sizeable amount.

160. GSMS reasonably relied on those promises because GSMS was owed millions of dollars in payments from Defendants. Further GSMS had qualified AP-NJ as

the government authorized supplier. GSMS could not instantly switch providers; rather government contracting provisions required compliance.

161.   In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 27, filed 27 Nov. 2019, Judge McNulty stated that, "whether Dr. Liu acted intentionally and with malice. Malice "focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934), '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse. *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 39 (1989) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (1950)); see also *Belinski v. Goodman*, 139 N.J. Super. 351, 354 A.2d 92, 94 (1976) (defining actual malice as "nothing more or less than intentional wrongdoing-an evil-minded act"). Here, the complaint asserts that Dr. Liu, without justification, acted out of his own-self interest to enrich himself at the expense of his obligations to AustarPharma. (See, e.g., Compl. Para. 6, 123). At the motion to dismiss stage, these are sufficient assertions of intent and malice."

162.   GSMS has been economically damaged. GSMS is indisputably owed the purchase credit amount. Further GSMS suffers its own failure to supply penalties due to the Defendants failure to supply.

## Count V – Unjust Enrichment As To All Defendants

163.   GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

164.   GSMS is indisputably owed millions of dollars. GSMS initially demanded a

full payment of that amount. At the pleading of at least AP-NJ and Liu, GSMS agreed to receive that credit in the form of the future product orders at reduced pricing. At least AP-NJ, Liu, and AIL-HK have received the benefit of the millions that GSMS agreed to amortize over future product shipments. These Defendants did not have to pay a lump sum of millions and kept that money. Furthermore, Defendants, including AP-NJ, have not paid the service level penalties and failure to supply penalties, and the wrongful withholding of that money payable to GSMS unjustly enriches the Defendants.

165.    The other Defendants, as explained herein, are in an enterprise. As such money retained by AP-NJ insures to the benefit of the other Defendants as those Defendants can use the money that AP-NJ and Liu are withholding.

166.    GSMS relied on bona fide compliance with the supply contracts in order to recover the millions it is owed. But the Defendants are not performing. As such, the Defendants are unjustly enriched by the lack of performance.

167.    Such unjust enrichment is inequitable because at least AP-NJ, Liu, AIL-HK know that the money is owed to GSMS. Yet despite promises to comply with the contractual requirements, it does not do so. This is inequitable.

168.    GSMS has been economically damaged. GSMS is indisputably owed the purchase credit amount. Further GSMS suffers its own failure to supply penalties due to the Defendants failure to supply.

## Count VI – Breach of Covenant of Good Faith and Fair Dealing As To AP-NJ

169.    GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

170.    It is undisputed that GSMS and AP-NJ have contracts in which AP-NJ is

obligated to perform. AP-NJ has a duty to operate fairly and in good faith with GSMS.

171.   AP-NJ is acting in bad faith and/or with malicious intent. AP-NJ repeatedly violates the terms of the contract by failing to deliver required quantities at the required times. AP-NJ then makes repeated promises to comply with the contracts, but then again fails to deliver. These repeated promises and changes to them evidence this bad faith dealing.

172.   GSMS is entitled to the benefit of the contracts it has, without the underhanded dealing by AP-NJ. GSMS benefits from the contractual bargains because it is the vehicle for which GSMS can satisfy its own obligations to its customers. Also the reduced price contracts are the vehicle to recover the millions that it is owed.

173.   In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 27, filed 27 Nov. 2019, Judge McNulty stated that, "whether Dr. Liu acted intentionally and with malice. Malice "focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934), '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse. *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 39 (1989) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (1950)); see also *Belinski v. Goodman*, 139 N.J. Super. 351, 354 A.2d 92, 94 (1976) (defining actual malice as "nothing more or less than intentional wrongdoing-an evil-minded act"). Here, the complaint asserts that Dr. Liu, without justification, acted out of his own-self interest to enrich himself at the expense of his obligations to AustarPharma. (See, e.g., Compl. Para. 6, 123). At the motion to dismiss stage, these are sufficient

assertions of intent and malice."

174.    GSMS has been economically damaged. GSMS is indisputably owed the purchase credit amount. Further GSMS suffers its own failure to supply penalties due to the Defendants failure to supply.

## Count VII – New Jersey and Federal RICO (18 U.S.C. §1962 et seq.) Violations As To All Defendants

175.    GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

176.    Each Defendant collectively or amongst themselves in combination with any other Defendant created an enterprise to defraud GSMS and breach the GSMS contracts. Each Defendant is jointly and severally liable for the damages GSMS claims.

177.    All Defendants collectively or individually have committed fraud, or participated in the fraud, against GSMS.

178.    Each Defendant individually or collectively created an enterprise that based on predicate act violations of multiple federal wire and mail fraud laws, and New Jersey state laws, committed multiple acts of racketeering.  More than twice, AP-NJ and the other Defendants acted in concert to perpetuate the fraud scheme, including but not limited to each telephone call, each email, each non-conforming shipment shipped across State-lines to GSMS, each payment received from GSMS, each use of interstate wires to effectuate orders and payments, etc. Defendants Liu and AP-NJ used wires and mail to instruct GSMS to make payments to a factoring company, located across State-lines, which then made payments to AP-NJ. It is undisputed that GSMS made payments to the factoring company, which made payments to AP-NJ.

179.    As stated herein, the Defendants made material representations of fact by repeatedly taking purchase orders from GSMS, not telling GSMS that it could not fulfill the orders in the required quantities and required timelines, then telling GSMS that orders could be fulfilled in new timelines, wherein such new timelines were continually missed and/or the shipments would be a fraction of the ordered quantities.

180.    Each Defendant participated in the enterprise to ensure that AP-NJ would not pay the full purchase credit to GSMS as that would cripple AP-NJ. Further, knowing the hardships that GSMS experiences by not being freely able to switch suppliers, the Defendants intentionally use the facilities to make other products, to supply the same products to others, and to extract further concessions from GSMS.

181.    The Defendants indisputably knew that such orders could not be fulfilled. They had already demonstrated an inability to meet its obligations. They knew that they could not fulfill the orders. When they made new promises, they knew they could not be kept. They kept shifting deadlines and quantities. They made false promises about adding shifts on weekdays and weekends.

182.    Defendants intended that GSMS rely on such statements because, among other things, Defendants were in the midst of their own internal lawsuits, some Defendants were in the process of squandering AP-NJ assets for the benefit of other Defendants, and that the purchase credit was for a sizeable amount.

183.    AIL-HK was in the midst of fraud litigation against AP-NJ and Liu. AIL-HK operated in conjunction with AP-NJ and Liu to ensure that AP-NJ did not pay the purchase credit to GSMS. The specific purpose of these instructions were to ensure that AIL-HK had assets against which to collect. It ensured that AP-NJ did not become

defunct and thus render worthless any investments AIL-HK made.

184.    GSMS reasonably relied on those promises because GSMS was owed millions of dollars in payments from Defendants. Further GSMS had qualified AP-NJ as the government authorized supplier. GSMS could not instantly switch providers; rather government contracting provisions required compliance.

185.    Because GSMS informed AP-NJ and AP-NJ knew that the sale of Product M and Product S were intended for the U.S. Government, AP-NJ and Defendants perpetrated a fraud on the U.S. Government in that by duping GSMS into staying in contract for those products (under false pretenses), GSMS would induce the Government into staying in contract with GSMS. The net effect, however, of the Defendants fraudulently actions resulted in the Government not receiving its products in a timely and required manner. And AP-NJ and Defendants knew that the Government itself was constrained by its contracts with GSMS to stay in contract because of the difficulty in sourcing qualified suppliers of Product M and Product S.

186.    In terms of Defendants violations, GSMS asserts that the Defendants violated, including but not limited to:

N.J.S. 2C:20-3. Theft by unlawful taking or disposition

N.J.S. 2C:20-4. Theft by deception

N.J.S. 2C:21-7. Deceptive business practices

N.J.S. 2C:21-16. Securing execution of documents by deception

18 U.S.C. § 1341 - Frauds and swindles

18 U.S.C. § 1343 - Fraud by wire, radio, or television

18 U.S.C. § 1349. Attempt and conspiracy

187.    In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al,* docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 27, filed 27 Nov. 2019, Judge McNulty stated that, "whether Dr. Liu acted intentionally and with malice. Malice "focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934), '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse. *Printing Mart-Morristown v. Sharp Elecs. Corp.,* 563 A.2d 31, 39 (1989) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (1950)); see also *Belinski v. Goodman*, 139 N.J. Super. 351, 354 A.2d 92, 94 (1976) (defining actual malice as "nothing more or less than intentional wrongdoing-an evil-minded act"). Here, the complaint asserts that Dr. Liu, without justification, acted out of his own-self interest to enrich himself at the expense of his obligations to AustarPharma. (See, e.g., Compl. Para. 6, 123). At the motion to dismiss stage, these are sufficient assertions of intent and malice."

188.    Defendants conduct qualifies an enterprise that is engaged in a pattern of racketeering that violates both NJ and Federal RICO laws.

## Count VIII – New Jersey Civil Conspiracy Violation

189.    GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

190.    Each Defendant collectively or amongst themselves in combination with any other Defendant created an enterprise to defraud GSMS and breach the GSMS contracts. Each Defendant is jointly and severally liable for the damages GSMS claims.

191.    All Defendants collectively or individually have committed fraud, or

participated in the fraud, against GSMS.

192.    Each Defendant individually or collectively created an enterprise that based on predicate act violations of multiple federal wire and mail fraud laws, and New Jersey state laws, committed multiple acts of racketeering.  More than twice, AP-NJ and the other Defendants acted in concert to perpetuate the fraud scheme, including but not limited to each telephone call, each email, each non-conforming shipment shipped across State-lines to GSMS, each payment received from GSMS, each use of interstate wires to effectuate orders and payments, etc. Defendants Liu and AP-NJ used wires and mail to instruct GSMS to make payments to a factoring company, located across State-lines, which then made payments to AP-NJ. It is undisputed that GSMS made payments to the factoring company, which made payments to AP-NJ.

193.    As stated herein, the Defendants made material representations of fact by repeatedly taking purchase orders from GSMS, not telling GSMS that it could not fulfill the orders in the required quantities and required timelines, then telling GSMS that orders could be fulfilled in new timelines, wherein such new timelines were continually missed and/or the shipments would be a fraction of the ordered quantities.

194.    Each Defendant participated in the enterprise to ensure that AP-NJ would not pay the full purchase credit to GSMS as that would cripple AP-NJ. Further, knowing the hardships that GSMS experiences by not being freely able to switch suppliers, the Defendants intentionally use the facilities to make other products, to supply the same products to others, and to extract further concessions from GSMS.

195.    The Defendants indisputably knew that such orders could not be fulfilled. They had already demonstrated an inability to meet its obligations. They knew that they

could not fulfill the orders. When they made new promises, they knew they could not be kept. They kept shifting deadlines and quantities. They made false promises about adding shifts on weekdays and weekends.

196. Defendants intended that GSMS rely on such statements because, among other things, Defendants were in the midst of their own internal lawsuits, some Defendants were in the process of squandering AP-NJ assets for the benefit of other Defendants, and that the purchase credit was for a sizeable amount.

197. AIL-HK was in the midst of fraud litigation against AP-NJ and Liu. AIL-HK operated in conjunction with AP-NJ and Liu to ensure that AP-NJ did not pay the purchase credit to GSMS. The specific purpose of these instructions were to ensure that AIL-HK had assets against which to collect. It ensured that AP-NJ did not become defunct and thus render worthless any investments AIL-HK made.

198. GSMS reasonably relied on those promises because GSMS was owed millions of dollars in payments from Defendants. Further GSMS had qualified AP-NJ as the government authorized supplier. GSMS could not instantly switch providers; rather government contracting provisions required compliance.

199. Because GSMS informed AP-NJ and AP-NJ knew that the sale of Product M and Product S were intended for the U.S. Government, AP-NJ and Defendants perpetrated a fraud on the U.S. Government in that by duping GSMS into staying in contract for those products (under false pretenses), GSMS would induce the Government into staying in contract with GSMS. The net effect, however, of the Defendants fraudulently actions resulted in the Government not receiving its products in a timely and required manner. And AP-NJ and Defendants knew that the Government itself was

constrained by its contracts with GSMS to stay in contract because of the difficulty in sourcing qualified suppliers of Product M and Product S.

200.    In terms of Defendants violations, GSMS asserts that the Defendants violated, including but not limited to:

N.J.S. 2C:20-3. Theft by unlawful taking or disposition

N.J.S. 2C:20-4. Theft by deception

N.J.S. 2C:21-7. Deceptive business practices

N.J.S. 2C:21-16. Securing execution of documents by deception

18 U.S.C. § 1341 - Frauds and swindles

18 U.S.C. § 1343 - Fraud by wire, radio, or television

18 U.S.C. § 1349. Attempt and conspiracy

201.    In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 27, filed 27 Nov. 2019, Judge McNulty stated that, "whether Dr. Liu acted intentionally and with malice. Malice "focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934), '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse. *Printing Mart-Morristown v. Sharp Elecs. Corp.,* 563 A.2d 31, 39 (1989) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (1950)); see also *Belinski v. Goodman*, 139 N.J. Super. 351, 354 A.2d 92, 94 (1976) (defining actual malice as "nothing more or less than intentional wrongdoing-an evil-minded act"). Here, the complaint asserts that Dr. Liu, without justification, acted out of his own-self interest to enrich himself at the expense of his obligations to AustarPharma.

(See, e.g., Compl. Para. 6, 123). At the motion to dismiss stage, these are sufficient assertions of intent and malice."

202.    Defendants conduct qualifies an enterprise that is engaged in a pattern of racketeering and civil conspiracy that violates both NJ and Federal RICO and conspiracy laws.

### Count IX - Conversion of GSMS's Money To Defendants' Unlawful Benefit

203.    GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

204.    Each Defendant collectively or amongst themselves in combination with any other Defendant created an enterprise to defraud GSMS and breach the GSMS contracts. Each Defendant is jointly and severally liable for the damages GSMS claims.

205.    It is undisputed that AP-NJ owes the purchase credit to GSMS. GSMS paid money to AP-NJ for the products it ordered and received. AP-NJ therefore ought to have the purchase credit money either actually or in escrow. After agreeing to the credit, it should have sequestered money to pay for the GSMS credit.

206.    Upon information and belief, each Defendant is withholding the money owed in the form of either an outright refund of the money or a failure to satisfy new orders at the reduced price.

207.    Because this is agreed to be GSMS's money, it is GSMS's property. The Defendants improper withholding of the money is wrongful and interferes with GSMS's right to that money.

208.    In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al,* docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 27,

filed 27 Nov. 2019, Judge McNulty stated that, "whether Dr. Liu acted intentionally and with malice. Malice "focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934), '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse. *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 39 (1989) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (1950)); see also *Belinski v. Goodman*, 139 N.J. Super. 351, 354 A.2d 92, 94 (1976) (defining actual malice as "nothing more or less than intentional wrongdoing-an evil-minded act"). Here, the complaint asserts that Dr. Liu, without justification, acted out of his own-self interest to enrich himself at the expense of his obligations to AustarPharma. (See, e.g., Compl. Para. 6, 123). At the motion to dismiss stage, these are sufficient assertions of intent and malice."

209.   As such, each Defendant individually or collectively have committed the tort of conversion of property.

### Count X – Tortious Interference With A Contract As To All Defendants Except AP-NJ

210.   GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

211.   Defendants, except for AP-NJ, have engaged in tortious interference with contract. It is undisputed that GSMS and AP-NJ have contracts for supply.

212.   Defendants, including Liu and AIL-HK are interfering with AP-NJ's contract because they are intentionally and without justification, forcing AP-NJ to not comply with its contractual obligations, by diverting AP-NJ resources away from AP-

NJ's obligations to fulfill the contracts, by making the required products but for other customers, and soliciting bids for the products to GSMS's customers.

213.    In an opinion in the case of *Austar International Limited v. AustarPharma LLC et al*, docket no.: 2:19-cv-08356, District of New Jersey, document no.: 64, page 27, filed 27 Nov. 2019, Judge McNulty stated that, "whether Dr. Liu acted intentionally and with malice. Malice "focuses on defendants' behavior. Although the common meaning of malice connotes ill-will toward another person, *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A.1934), '[m]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse. *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 39 (1989) (citing *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (1950)); see also *Belinski v. Goodman*, 139 N.J. Super. 351, 354 A.2d 92, 94 (1976) (defining actual malice as "nothing more or less than intentional wrongdoing-an evil-minded act"). Here, the complaint asserts that Dr. Liu, without justification, acted out of his own-self interest to enrich himself at the expense of his obligations to AustarPharma. (See, e.g., Compl. Para. 6, 123). At the motion to dismiss stage, these are sufficient assertions of intent and malice."

214.    These actions cause GSMS damage because GSMS is in a chronic failure to supply its own customers that causes economic and reputational harm.

### Count XI: Declaratory Judgment of No Contract Breach by GSMS

215.    GSMS re-alleges and incorporates all allegations stated as if fully set forth herein.

216.    GSMS is entitled to assess, by virtue of the product supply agreement, failure to supply penalties against AP-NJ because of AP-NJ's failure to supply Products

M and S.

217.   There is no dispute that AP-NJ did not deliver Products M and S per the terms of the product orders.

218.   The GSMS contract requires AP-NJ to prioritize manufacture and supply of Products M and S to GSMS first, before selling to other third parties. It is undisputed that AP-NJ makes Products M and S, de-prioritizes GSMS, and shockingly sells the very product to GSMS's competitor.

219.   Upon information and belief, AP-NJ intends to file suit against GSMS to obtain full payment for Product M that GSMS received.

220.   AP-NJ owes GSMS millions of dollars by virtue of the purchase credit, failure to supply penalties, and impending Government service level penalties.

221.   Given that: (i) AP-NJ does not have any bank accounts in its name; (ii) AIL-HK accused Defendants including AP-NJ of fraud and squandering assets; (iii) GSMS pays a third party factoring company instead of AP-NJ itself; (iv) AP-NJ's own landlord sued AP-NJ for failure to pay rent; (v) Liu has to personally guarantee the rent; and (vi) AP-NJ makes products for third parties that compete directly with GSMS; all leads to a reasonable conclusion that any payment made to AP-NJ will be squandered, fraudulently transferred to other entities, or used to make product for its own competitors, all with the intent to deprive GSMS of the benefit of its contract and subject it to economic losses.

222.   If GSMS owes any money to AP-NJ based on product deliveries, such money cannot be paid to AP-NJ until all monies owed to GSMS are paid by AP-NJ.

223.   GSMS seeks a declaration from this court that if AP-NJ (and other

Defendants) owes more money to GSMS than any money that GSMS owes to AP-NJ, and because the underlying conducts are intricately intertwined with all other claims and counts, that GSMS is not required to pay any money to AP-NJ until all of GSMS claims against AP-NJ are fully adjudicated.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, jointly and severally, for the relief as follows:

1. Entry of a judgment providing for injunctive relief prohibiting Defendants from engaging in any future operations in New Jersey, pursuant to NJ RICO and Federal RICO statutes;

2. An award of triple damages totaling $11,457,159 (three times the $3,819,053 compensatory damages), as mandated by NJ RICO and Federal RICO statutes;

3. An award of punitive damages;

4. Reasonable attorneys' fees and costs of suit in connection with this action pursuant to NJ RICO and Federal RICO statutes;

5. An entry of judgment on all Counts; including a declaration from this Court that GSMS is not required to pay any monies to any Defendant;

6. Place AP-NJ, and all its assets, into a constructive trust so as to avoid the continued depletion of AP-NJ's assets and to ensure that assets are available to pay the damages owed to GSMS;

7. Pre-judgment and post-judgment interest; and

8. Such other and further relief as the Court deems equitable and just.

Dated: July 13, 2021                           Respectfully submitted,

                                               STAMOULIS & WEINBLATT LLC

                                               */s/Stamatios Stamoulis*
                                               Stamatios Stamoulis
                                               New Jersey No. 1790-1999
                                               800 N West Street, Third Floor
                                               Wilmington, DE 19801
                                               Telephone: (302) 999-1540
                                               Facsimile: (302) 762-1688
                                               stamoulis@swdelaw.com

                                               Shashank Upadhye
                                               Yixin Tang
                                               Brent Batzer
                                               UPADHYE TANG LLP
                                               109 Symonds Drive, #174
                                               Hinsdale, IL 60522-0174
                                               shashank@ipfdalaw.com
                                               yixin@ipfdalaw.com
                                               brent@ipfdalaw.com